Battle, J.
 

 There is but a single question presented in this
 
 *230
 
 case, and that is, whether under the Act of 1846, ch. 67, sec. 6, the owner of slaves shall enlist them for taxation in the county in which he resides, or in that where the slaves may be hired out during the year in which they are to be enlisted. The question is one of much practical importance, and is not entirely free from doubt. The difficulty has arisen from the fact, the Legislature, in making a partial change in the former revenue law, did not advert to all the provisions of that law, and has thereby left it as a question of construction, instead of plainly expressing whether certain other changes which seem to be rendered necessary by the new act, are to be adopted or not. This difficulty can be cleared up only by taking a view of the former acts, and considering the mischief which the new enactment was intended to remedy. We can then determine, with some degree of certainty, how far we can be justified in putting such a construction upon the Act of 1846, as will accomplish the intention of the law makers.
 

 The 102nd chapter of the Revised Statutes, passed in the year 1836, was a revision and consolidation of all the revenue laws which had been enacted and were in force’prior to that time. In the 24th section, after providing for the enlistment by the inhabitants of the several counties in their respective districts, of lands, white polls, free negroes and mulattoes, it proceeds as follows :— “ the number of slaves, male and female, between the ages of twelve and fifty years, which to them belong, or who live in then-family, said slaves to be listed in the county where they reside.” This section, so far as it relates to slaves, was taken from the Acts of 1784, (Rev. Code, ch. 195, sec. 1,) and 1822, (Taylor’s Rev. ch. 1129, sec. 10.) The manifest meaning of it is, that hired slaves were to be listed for taxation in the county where the slaves resided. The counsel for the plaintiff indeed, contends that the pronoun “they” refers to the owners or hirers, and not to the slaves, alleging as a reason, that slaves cannot, in a legal sense, be said to have a residence any where. Whether the criticism upon the meaning of the word “reside,” when used in connection with slaves be in general correct or not, it is certain that it was so used in the Act of 1822 above referred to, the language of which is “ that all free males between the ages of twenty-qne and
 
 *231
 
 forty-five years, and all slaves between the ages of twelve and fifty years, shall pay a poll tax, and all slaves shall be listed in the county wherein they reside.” The previous Act of 1784 had omitted to specify particularly the county where the slaves were to be listed, requiring only that the inhabitants of the several counties should, in their respective districts, list
 
 “
 
 the number of slaves male and female, between the ages of twelve and fifty', which to them belonged, or who lived in their family.” We cannot perceive that the meaning of the two acts is at all changed by their having been brought together and included in the same section of the Revised Statutes. Such then, was the law in relation to the enlistment of slaves for taxation, at the time when the Act of 1846 ch. 67 was passed, to wit, that slaves retained in the service of the owner were to be listed by such owner, and hired slaves by the hirer; and in both cases they were to be listed in the county where the slaves resided. The mischief existing under this 'arrangement was, that hirers of slaves, having but a temporary interest in them, for that and perhaps other causes, failed to enlist them, and such failure not being discovered by the sheriffs, the State was deprived of much revenue which ought to have been derived from this source. This mischief, it may be presumed, was for many years not seriously felt while slaves were generally hired out to persons in the county in which they were owned ; but when they began to be earned to other and perhaps distant counties to labor in mines, and on works of internal improvement, and were frequently removed from one place or county to another, the loss of the State became so great that it attracted the attention of the Legislature, and produced the act now under consideration. The 6th section of this act declares expressly that
 
 ee
 
 in all cases the owner or owners of taxable slaves of this State, and not the hirer, shall enlist them for taxation, whether they be in possession of the owner on the first day of April or not;” providing that when the owner or owners shall reside out of the State, then the slaves shall be enlisted by the hirers. The act is silent as to the county where the slaves shall be given in, and hence the doubt which has caused the present suit. The plaintiff contends that by a
 
 necessary construction,
 
 they must be enlisted in the
 
 *232
 
 county where the owner resides ; while the defendant insists that
 
 the place
 
 where they are to be enlisted remains as it was before. Arguments of no little weight, from the inconveniences of either construction, may be urged against it. But without attempting to advert particularly to every objection which may be offered to either viqw, we will state one or two, of such overwhelming force against the latter, that we cannot think that it is in accordance with the intention of the Legislature.
 

 In the first place then, it would be very difficult, if not impossible, for an owner who had slaves hired out in several different counties in the same year, to enlist them in the respective counties where they were employed, during the time (to wit, the last twenty working days in July,) in which that duty must be performed. This difficulty would be still greater where the slaves were hired to a Railroad Company, to be employed in repairing the road or to act as train hands. The owner could hardly find out where his slaves were on the first day of April, the time to which the listing must refer. But it is said that the owner may employ an agent to list the slaves for him. The answer to that is, that if generally adopted, it would produce the very mischief which the Act of 1846 was intended to remedy — a mischief so great, that Governor Swain in his message to the Legislature in 1834, stated that in 1830 the whole poll tax, white and black, produced only $28,211, when the tax on slaves alone, had they been properly'given in, would have produced about $24,000.
 

 Another objection would be the great difficulty of collecting the tax. The 45th section of the revenue act in the Revised Statutes, which is unaltered by the Act of 1846, provides
 
 ‘‘
 
 that it shall be the duty of the sheriffs to collect the public taxes from each and every individual in their counties respectively, who are liable to pay taxes, whether their names be contained in the list of tax-ables delivered by the clerks or not; and in all cases where the public taxes shall be demanded of any person, whose name and taxable property are not contained in the list furnished by the clerk, the sheriff shall demand and receive from each and every such person a sum equal to double the amount which he would have been liable to pay, in case a list of his taxable property had been given in due time, and according to law ” &c. Now sup
 
 *233
 
 pose a slave whose owner resides in a distant county has been omitted to be listed in the county in which he is hired out, how can the sheriff proceed to collect the double tax, without first demanding it of the owner ? And in such case, is it not manifest that the costs of making the demand and collecting the tax would often be greater than the tax itself? The Legislature certainly never intended to adopt a plan which would produce such a result. These almost insuperable objections are avoided by adopting the construction contended for by the plaintiff. The owner must know, or can easily ascertain how many slaves he has, either retained in his own service or hired out, for whom he is liable to pay tax, and will be more likely to list them in his 'own county than in the county or counties where they are
 
 hired;
 
 and then the sheriff will have very little trouble or expense in collecting the tax due upon them. But it is urged against this construction, that if slaves who are hired out in another county be not listed in the county where their owner resides, the sheriff of the county where the slavbs are, cannot know whether they have been listed in the proper county, and the tax will be lost. That may be so ; but admitting it, and admitting further that the sheriff of the county where the owner resides may also not find out the omission, the evil, we have reason to suppose, would be much less than it was under the former law, or will be, if the construction contended for by the defendant were adopted. It is upon the conscience of the tax payers, more than upon the vigilance of the fax collectors, in finding out unlisted property, that the State must mainly rely for raising its revenue. This revenue will be the same to the State, whether it shall come from one county or another ; and we confidently believe, that much more will be derived from requiring the owners of slaves to enlist them in the counties where such owners reside, than in the counties where the slaves are hired.
 

 We understand that since the Act of 1846 this course has generally been pursued, and its good effects are already manifest. In 1830, the whole poll tax paid into the Public Treasury was as we have already stated-, $28,211. For 1846, just before the act under consideration went into operation, the poll tax was $33,062, an increase in sixteen years of only $4,851, while in
 
 *234
 
 1849 it was $35,010, an increase of nearly two thousand dollars in three years. We indulge the hope that the increase will be still greater after this decision is known, to wit, that it is the duty of every owner having slaves hired out, who resides in the State, to enlist them for taxation in the county of his residence.
 

 We have said nothing about the power of the County Courts to lay a tax upon all taxable slaves employed within their respective counties, because no question in relation to it is raised by the case agreed. The only question before us arises upon the construction of the 6th section of the Act of 1846, ch. 6T, and upon that we differ from his Honor, and must direct the judgment of nonsuit to be set aside, and judgment to be rendered in favor of the plaintiff for six pence damages.
 

 Per Curiam. Nonsuit set aside, and judgment for the plaintiff.